IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| MARK ANTHONY ROY, | § | |
| Institutional ID No. 02408963, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:23-CV-00032-BU[1] |
| | § | |
| AKWITTI, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Mark Anthony Roy, an inmate incarcerated by the Texas Department of
Criminal Justice (TDCJ), brings this conditions-of-confinement claim under 42 U.S.C.
§ 1983 against Warden Chimdi Akwitti and Assistant Warden Phillip McCain. *See* Dkt.
No. 21. Defendants now bring a Motion for Summary Judgment asserting qualified
immunity. Dkt. No. 33.

For the reasons below, the undersigned RECOMMENDS that the Court GRANT
Defendants' Motion.

## I.    JURISDICTION

Roy brings this action under 42 U.S.C. § 1983, providing the Court with subject-
matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Venue is proper in the Northern

---

[1] This case was stayed and administratively closed, then reopened and the stay lifted on November 22, 2024.
Dkt. No. 27.

District of Texas, Abilene Division, because the events giving rise to Roy's claims occurred at TDCJ's John Middleton Unit in Jones County, Texas. *See* Dkt. No. 1. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix transferred this case to the undersigned for preliminary screening. Dkt. No. 6; 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL BACKGROUND

As alleged, Roy and 220 other inmates were required to sleep on the floor of the gym while at the Middleton Unit. Dkt. No. 1 at 6. Roy is one of at least eleven "gym floor" plaintiffs who allege similar facts. Dkt. No. 21 at 2. Through the Court's review of the gym-floor cases, the Court learned that inmates were likely assigned to the gym according to an overarching policy of placing inmates with heat restrictions in air-conditioned housing. *Id.* at 3 fn 4. Each plaintiff, including Roy, appears to have had a heat restriction based on a medical condition, a mental health condition, or a prescribed medication, and the gym at the Middleton Unit had air conditioning.[2] *Id.*

Roy arrived at the Middleton Unit on September 12, 2022, and remained there until his transfer to the Lindsey Unit on November 26, 2022. Dkt. No. 1 at 6. Three days after arriving at Middleton, Roy had an intake physical exam. During that exam, he disclosed

---

[2] It is not clear from the record whether other parts of the Middleton Unit also had air conditioning at the time. A TDCJ inter-office communication in the authenticated records explains the following:

> "Inmates that are assigned to the gym are placed there due to them having a heat score of at least P-01 or higher. Dormitories that are on the John W. Middleton are not equipped with controlled air. The gym has been equipped with temporary air conditioning for housing of inmates with this score … The gym is not equipped to house inmates of that capacity [150 to 200] for an extended time period."

that at age seven he was run over by a school bus requiring reconstructive surgery placing screws and pins in his hips. Dkt. Nos. 20 at 11:08[3]; 1 at 6; 36 at 72. He also disclosed "severe chronic pain" and a lower-bunk restriction due to this childhood incident, which the record reflects. Dkt. Nos. 1 at 6; 12 at 3; 36 at 72, 123 (reflecting a lower-bunk only assignment since 3/5/2004). He further reported "severe fatigue" and "difficulty falling asleep." Dkt. No. 36 at 72. Despite these documented medical issues and restrictions, Roy was provided only a quarter-inch thick mattress made of cotton to sleep on. Dkt. No. 20 at 11:10.

Roy alleges that sleeping on the floor was exacerbated by several other gym conditions. For instance, rats crawled amongst the inmates, day and night, and would crawl under blankets to access inmates' commissary food. *Id*. at 11:16. Additionally, there was rat feces in Roy's food. *Id*.

Roy also alleges that plumbing and bathroom issues further exacerbated the gym conditions. He claims that 220 inmates had to line up to use one urinal and that the two toilets in the bathroom backed up and leaked raw sewage into the first and second rows where inmates slept. Dkt. Nos. 1 at 6; 20 at 11:21–22. Roy states he was on the third row, but regardless, the same mop that was used to clean the sewage in the bathroom was the same mop they used in the gym area; creating an unsanitary environment. Dkt. No. 20 at 11:21–22.

Roy details instances where Akwitti and McCain visited the gym and were

---

[3] Citations to Roy's *Spears* hearing refer to the time of day; so a timestamp for 11:08 refers to a statement made at 11:08 a.m.

confronted by inmates complaining about the living conditions. Roy says that he spoke with Akwitti four to five times about the conditions and McCain two to three times. 11:17–20. Their purported responses were along the lines of, "we're working on it." *Id*. He also alleged that he "told the Wardens every time they came into the gym" that he had a lower-bunk restriction. Dkt. No. 12 at 3. Despite these interactions, the conditions never improved during the 75 days Roy was housed on the gym floor. Dkt. No. 12 at 4.

Roy brings this §1983 claim against Defendants in their individual capacities seeking $55,000.00 in punitive damages against each Defendant. Dkt. No. 1 at 4.

### III.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material[,]" but it must be one that "might affect the outcome of the suit[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine within the meaning of Rule 56 only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).

A governmental employee who is sued under § 1983 may assert qualified immunity as an affirmative defense to liability. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the

4

plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When qualified immunity is asserted in a motion for summary judgment, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). Movants have no burden "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). "[O]nce properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). This means the plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

In deciding whether a plaintiff has shown a violation of a protected right sufficient to survive summary judgment, courts consider the facts alleged in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). But "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, 'or only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The plaintiff must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also RSR Corp. v. Int'l Ins.*

5

*Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Furthermore, "[t]he court has no duty to search the record for material fact issues." *RSR Corp.*, 612 F.3d at 857; *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

## IV.    ANALYSIS

To overcome Defendants' assertion of qualified immunity on summary judgment, Roy must show the existence of a fact issue on each of the following: (1) objectively, Defendants exposed him to a substantial risk of serious harm by denying him the minimal measure of life's necessities; (2) subjectively, Defendants were deliberately indifferent to the risk; (3) the law was clearly established that Roy had a constitutional right to be free from the alleged conditions; and (4) in light of clearly established law Defendants conduct was objectively unreasonable.

The first and second elements relate to the first prong analysis—a constitutional violation. The third and fourth elements relate to the second prong analysis—clearly established law. The undersigned will address each element in turn.

Roy did not produce any evidence in response to Defendants' Motion. However, the Court may consider Roy's verified allegations—including the complaint, response to the magistrate judge's questionnaire, and testimony at Roy's *Spears* hearing—as competent summary judgment evidence. *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Furthermore, at this stage, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*,

391 F.3d 653, 655 (5th Cir. 2004).

### 1. The First Prong: Constitutional Violation

#### a. Eighth Amendment Conditions of Confinement

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *Rhodes* v. *Chapman*, 452 U.S. 337, 349 (1981); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An Eighth Amendment violation occurs when prison conditions pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials act with deliberate indifference to the risk posed—a subjective test. *Garrett v. Lumpkin*, 96 F.4th 896, 900 (5th Cir. 2024).

The objective component also requires showing that the conditions were objectively "sufficiently serious" or "extreme." *Farmer*, 511 U.S. at 834 (citation omitted) (first quote); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (second quote). The deprivation must involve a basic human need—such as food, clothing, medical care, and safe and sanitary living conditions—and must deny the inmate of the minimal civilized measure of life's necessities. *Hope v. Harris*, 861 F. App'x 571, 582 (5th Cir. 2021); *Chapman*, 452 U.S. at 347–49. The conditions are measured against the standards of decency that mark the progress of a maturing society. *Chapman*, 452 U.S. at 346–48.

For the objective component, the Court must examine the totality of the circumstances. *Id*. at 363–64. Even if no single condition of confinement alone would be

unconstitutional, exposure to multiple conditions may subject inmates to cruel and unusual punishment when they have a "mutually enforcing effect" that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (explaining that there may be an Eighth Amendment violation where a prisoner complained of a "low cell temperature at night combined with a failure to issue blankets").

The subjective component requires proof that the prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at 834 (to violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind). The standard is not met merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

Therefore, the inmate must show that prison officials were: (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) "subjectively drew the inference that the risk existed"; and (3) "disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Farmer*, 511 U.S. at 837) (alterations omitted). More simply, the prison officials must know of, and disregard, an excessive risk to a prisoner's health or safety. *See id.* (citation omitted). Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

b.  Objective Component

8

Roy contends that he was forced to: (1) sleep on the floor; (2) on a quarter-inch mattress; (3) in a rat-infested gym; (4) with one urinal and two leaking toilets for 220 inmates; and (5) that plumbing issues caused unsanitary living conditions, all of which constitutes cruel and unusual punishment. Dkt. Nos. 1 at 6, 20 at 11:10–11, 11:15–16, 11:21–22. He adds that these conditions were exacerbated by his documented medical conditions and the length of time he was forced to endure the conditions. *See generally* Dkt. No. 20 at 11:06–22.

### i.   *The gym conditions*

Defendants do not appear to contest that many, if not all, of the alleged conditions existed. Rather, they argue that "[m]aintenance was done, several repairs were made to the urinals and toilets, steps were taken to control the temperature in the gym, and pest control measures were in place throughout Roy's time at the Middleton Unit." Dkt. No. 34 at 6. The existence of the alleged conditions then appears to be undisputed, but Defendants insist that they were "not in and of themselves objectively extreme." *Id*.  at 8. The undersigned agrees with this assessment as far as it goes. There exists little, if any, caselaw to support that any of the alleged conditions, in isolation, was a constitutional violation.[4] *Id*. at 8–9.

---

[4] *Elliott v. Cerliano*, No. 6:20-CV-00446, 2022 WL 2496200 (E.D. Tex. July 6, 2022) (presence of pests, without more, does not amount to a constitutional violation); *Lett v. La Salle Sw. Corr*., No. 3:21-cv-02257-S (BT), 2023 U.S. Dist. LEXIS 194118 (N.D. Tex. Sep. 7, 2023) ("only in extreme circumstances do unsanitary conditions rise to the level of a constitutional deprivation"); *Sowell v. Kyle*, No. 2:08-CV-0051, 2011 U.S. Dist. LEXIS 10384 (N.D. Tex. Jan. 13, 2011) (the court found that water being turned off in a cell due to a toilet overflowing, and the toilet containing items in it, causing the plaintiff to have to sleep near it for a limited amount of time, was not a constitutional violation); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir.1996) (the Eighth Circuit found that an inmate's four day confinement in a cell with an overflowing toilet, creating a stench of feces and urine, did not violate the Eighth Amendment); *Conlin v. Thaler*, 347 F. App'x 983, *1 (5th Cir. 2009) (finding that an inmate's claim that his sleeping mat is uncomfortable and caused him to lose sleep does not allege a constitutional violation); *Castillo v. Cameron County*, 238 F.3d 339, 354 (5th Cir. 2001) ("[A]lthough overcrowding may give rise to unconstitutional

But a court evaluating a conditions-of-confinement claim must consider the totality of the circumstances a prisoner was forced to endure. *Chapman*, 452 U.S. at 363–64. The objective circumstances here include not only the individual conditions themselves, but whether they acted in combination with each other, their duration, and the health of the inmate to have the mutually enforcing affect of creating a constitutional violation. Given the conditions themselves are mostly undisputed, the undersigned turns first to Roy's preexisting medical conditions before turning to the duration of his exposure to harm.

> ii. *Roy's medical conditions*

Defendants acknowledge that Roy and others were assigned to the gym due to their medical needs or compromised medical conditions. Dkt. No. 34 at 6. But Defendants do not elaborate on the process or criteria used in making these assignments, the reason floor assignments in the gym were necessary in the first place, or how long the wardens expected floor assignments to last once they were implemented. These questions cannot be answered on this record.

Defendants do not dispute that Roy had a preexisting hip injury—nor could they on this record. Their argument instead, is that Roy "never complained about his preexisting hip injury being aggravated by sleeping on the gym floor." *Id*. at 9. And that the only time he complained of hip pain was over a year later when he refused to be evaluated by medical personnel." *Id*.

Although true, several observations within the medical record provide insight into

---

conditions, overcrowding itself is not per se unconstitutional.").

whether the gym-floor conditions—objectively—posed an unreasonable *risk* of serious damage to Roy's health. For example, three days after being assigned a spot on the gym floor, Middleton's intake exam reflected Roy's childhood reconstructive surgery, "severe chronic pain", a past neck trauma/injury, and leg pain when walking. Dkt. No. 36 at 72–73. And shortly after transfer to the Lindsey Unit, the Lindsey medical staff notes: "Limited ROM to bilat hips and Left knee from previous surgeries. Unable to squat or fully bend down." *Id*. at 10.

Further, Roy's records reflect a "Bunk Assignment Lower Only" restriction since 2004. *Id*. at 123.  And yet Roy was assigned to sleep on the gym floor despite even his lower-bunk restriction, the supposed purpose of which is to make getting in and out of bed easier. In that respect, the floor is no better than an upper bunk. But notwithstanding this restriction and the intake notations of "chronic severe pain", Roy was assigned a spot on the gym floor and provided a quarter-inch thick mattress for his entire 75-day stay at Middleton.

All to say, the *existence* of Roy's medical conditions—some of which reasonably would have counseled against a floor assignment—does not appear to be disputed and are part of the totality of circumstances the Court, and a reasonable jury, should consider in assessing whether Roy was objectively exposed to a substantial risk of serious harm.

   iii. *Duration of Roy's exposure to conditions*

Generally, extremely egregious conditions, even for a short duration, can give rise to an Eighth Amendment claim. *See Taylor v. Riojas*, 592 U.S. 7, 52–54 (2020) (filthy cell with massive amounts of feces, four days; then frigid cell with clogged drain and no

clothes, two days). The calculus obviously runs in the other direction, as well—less egregious conditions can become a constitutional violation if a prisoner is forced to endure them for a long time. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (holding that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards" and observing that "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months").

The Defendants do not dispute that Roy was assigned a spot on the gym floor for his entire 75-day stay at Middleton. They also do not dispute that the conditions never improved during his stay.

That Roy endured these conditions for 75 days is particularly concerning. As the *Hutto* court observed, the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. 437 U.S. at 686–87. Here, considering the facts in a light most favorable to Roy, a reasonable jury could find that he was exposed to the combined conditions for 75 days and that this duration aggravated the severity of the overall deprivation. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part). Ultimately, the combined conditions "might have been tolerable for a few days" but a reasonable jury could find that they became "intolerably cruel" when endured for 75 days. *See Hutto*, 437 U.S. at 686–87. It must also be remembered that the sole reason Roy and the other inmates were in the gym was because TDCJ recognized they were medically unable to endure the heat.

### iv.    *Mutually enforcing effect of conditions*

The summary judgment evidence fails to resolve genuine factual disputes about

whether the combined conditions—rats, thin mattress, no bunk or cot, overcrowding, backed up plumbing—had a mutually enforcing effect of objectively depriving Roy of the basic human need of safe and sanitary living conditions. As discussed, the Court must further consider these combined conditions in the context of: (a) Roy's medical conditions when assigned to the gym; and (b) the duration of Roy's exposure to the gym conditions. *Harris*, 861 F. App'x at 582. Roy's verified pleadings provide more than a scintilla of evidence from which a reasonable jury could resolve these issues in his favor, and Defendants have failed to sufficiently rebut these claims to remove them from the province of a jury.

c.    Subjective Component

Having determined that fact issues exist as to whether Roy was objectively exposed to a substantial risk of serious harm, the undersigned turns now to whether Roy can show genuine disputes on whether each warden acted with deliberate indifference to that risk.[5] *See Farmer*, 511 U.S. at 834. The undersigned begins with Akwitti.

i.    *Warden Akwitti's subjective indifference*

Roy asserts that Akwitti was directly aware of the conditions in the gym. According to Roy, he spoke with Akwitti four to five times about the conditions. Dkt. No. 20 at 11:17–20. Each time he spoke to Akwitti, he informed him of his lower-bunk restriction. Dkt. No. 12 at 3. Roy states that Akwitti's response was something along the lines of "we're working

---

[5] The court must address the actions of each warden individually to determine whether qualified immunity applies. *Cass*, 844 F.3d at 730-31; *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

on it." Dkt. No. 20 at 11:18–20.

Roy explains that people from Huntsville came in to take pictures of the gym and interview inmates; suggesting that Akwitti subjectively drew the inference that a risk of serious harm existed and that the conditions in the gym presented a real problem. *Id.*; *Cleveland*, 938 F.3d at 676. Roy further alleges that Akwitti repeatedly told Roy he would have them all out by the first of the month. *Id.* When this didn't happen on the first of October or on the first of November, Roy lost faith in anything Akwitti said and believed he was not actually making any accommodations to get them out; implying Akwitti disregarded the risk posed by the gym conditions. *Id.*; *Cleveland*, 938 F.3d at 676.

Combined with Roy's allegation that the conditions never improved, the verified pleadings could reasonably support a finding that Akwitti personally visited the gym multiple times and was fully aware of whatever conditions existed. On this, there is no genuine dispute. Common sense also dictates that, even on Defendants' version of the facts, the warden would have not only known of the conditions, but also would have made or approved the decision to house inmates in the gym and established the criteria for such assignments.

It is also undisputed that Akwitti understood the medical vulnerability of the inmates assigned to the gym. Defendants admit that "[b]ecause of Roy's prescription medication, he, along with several other inmates, was housed on the gym floor for a brief period." Dkt. No. 34 at 6. In other words, inmates were assigned to the gym precisely because they had medical or mental health conditions and were being treated for the same. It is reasonable to infer that Akwitti further knew that those housed there, including Roy, faced heightened

14

medical risks if confined under other adverse conditions, including those that were unsanitary, overcrowded, unsafe, or otherwise unhealthy.

The duration of Roy's stay further strengthens the inference of deliberate indifference. A reasonable jury could conclude that Akwitti had ample opportunity during those 75 days to observe and correct the conditions. In other words, this was not a situation requiring split-second decision-making or an emergency response where qualified immunity typically affords officers the benefit of the doubt. *See Villarreal v. City of Laredo*, 134 F.4th 273, 284 (5th Cir. 2025) (Oldham, J., concurring). The longer Roy was in the gym, the more likely it was that Akwitti was both aware of the conditions and had time to effectively abate them, including by relocating the inmates, providing cots, stepping up maintenance and pest control, or other measures, but instead disregarded the risk. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part).

Defendants advance one principal argument here: Akwitti could not have been deliberately indifferent because the record shows he "took reasonable measures to repair amenities and to abate the presence of pests." Dkt. No. 34 at 10. But those measures must be reasonable. *Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable* measures to abate it.") (emphasis added). A reasonable jury could conclude that even repeated attempts to resolve a condition when officials know the attempts are inadequate are overall unreasonable.

Further to this point, Defendants fail to provide context from which the Court can

determine whether these remedial actions were reasonable. Akwitti claims that between March 3, 2022, and November 8, 2022, maintenance addressed gym plumbing issues 18 times and that between September 2022 and December 2022 pest control was brought in 5 times. Dkt. No. 34 at 11. But the reasonableness of making 18 plumbing repairs in eight months can only be assessed after knowing how many plumbing repairs were in fact needed during that same time. The record is silent on that fact. If the toilets, urinals, and sinks were in a constant state of disrepair despite intermittent fixes—not an unreasonable inference in a confined space with 220 inmates—that might reflect on the reasonableness of 18 repairs over eight months. Same with pest control. If there was an intractable rat infestation in a gym where 220 inmates were forced to sleep on the floor—which also has support in the summary judgment evidence—then are five pest control treatments reasonable?[6]

Given the variables involved, the answers to these questions are difficult to resolve on this record. This is partly because the alleged conditions are by their nature fact intensive. But it is also because the maintenance and pest control records in the summary judgment evidence are of little help. For instance, the undersigned can only find 16 instances of gym plumbing repairs between March and November 2022, and four of those were made to the officers' restroom in the gym. *See* Dkt. No. 36 at 139–71. Of the

---

[6] Several entries in the records tend to corroborate Roy's assertions that the gym was infested with rats and other sanitation issues. For instance, one pest report notes that the "kitchen was very dirty, with lots of food everywhere, trash all over the place, water standing on the ground, and lots of rats seen taking food from the floor." Dkt. No. 36 at 177 (cleaned up). Another states, "Rodent droppings in food services, dry storage, commissary, and medical. Units all dirty. Housing areas need to clean around trash cans." *Id*. at 179 (cleaned up). Another states, "Water on ground in kitchen. Horrible smell. Removed a dead rat from kitchen." *Id*. at 176. Another states, "Kitchen needs cleaning. Water and food on ground. All housing areas needs to be cleaned." *Id*. at 175. And yet another states, "Dirty and wet. Food all over ground. Food swept into piles. Trash laying around." *Id*. at 180 (cleaned up).

remaining 12 repairs to the inmate portion of the gym, only three of those were made during the time Roy might have been assigned to the gym. And all three were made on the same day, November 9, 2022. *Id.* at 166. While it is possible that three plumbing repairs on a single day were a reasonable response to the gym's plumbing problems during the two-and-a-half months Roy was at the Middleton Unit, the summary judgment record does not help answer that question, and a reasonable jury might regard that response as unreasonable.

The records provided by Defendants on pest control are even less helpful. Defendants argue that "Pest Control Records show that on September 9, 2022, October 12, 2022, November 1, 2022, December 5, 2022, and December 7, 2022, pest control was brought in to apply pest control measures." Dkt. No. 34 at 11. Again, context is important. The record supports that pest control services visited the Middleton Unit five times from September through December. Dkt. No. 36 at 120–27. But the record only supports that the gym was treated on one of those occasions, on September 6. *Id.* at 177.

The summary judgment evidence establishes that Akwitti took some remedial measures over several months in response to the conditions in the gym, and elsewhere. The evidence further establishes that the measures that were taken were themselves reasonable. But the Fifth Circuit has held that taking some reasonable measures does not mean an officer, on the whole, behaved reasonably. *Converse v. City of Kemah*, 961 F.3d 771, 779 (5th Cir. 2020) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395–96 (5th Cir. 2000)). A reasonable jury could find that despite Akwitti taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole,

reasonable. And that it may not have been, on the whole, reasonable to address only some of the conditions—rats and plumbing—while ignoring some of the more dangerous conditions that posed a substantial risk to Roy's health and safety—sleeping on the floor and overcrowding.

Thus, based on the summary judgment evidence, a reasonable jury could find: (1) Akwitti was aware that a large number of inmates, including Roy, were assigned to the gym, and that Akwitti likely made that decision; (2) due to the inmates having either a medical or mental health condition or treatment; (3) Akwitti was aware of the adverse conditions in the gym; (4) Akwitti was aware the conditions persisted for months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether Akwitti acted with deliberate indifference.

### ii.   *Assistant Warden McCain's subjective indifference*

Turning now to Assistant Warden McCain, Roy alleges they spoke on two to three occasions regarding the conditions and that he also informed McCain of his lower-bunk restriction. Dkt. Nos. 12 at 3; 20 at 11:17–20. McCain told Roy "we're working on it" but the conditions never improved. Dkt. Nos. 12 at 4; 20 at 11:17–20.

McCain, unlike Akwitti, submits a sworn declaration stating: "While plumbing was a consistent issue, maintenance was called often for repairs, and all inmates housed in the Gym at the Middleton Unit during my tenure had access to a toilet although they may have had to wait in line periodically due to the volume of inmates." Dkt. No. 36 at 183. In the

declaration, McCain also speaks about a "fly problem" and says he "personally brought in fly strips." *Id*. Here again McCain argues that he "took reasonable measures to repair amenities and to abate the presence of pests," and thus he was not deliberately indifferent. Dkt. No. 34 at 10.

The record of remedial measures is a two-edged sword. Yes, they are evidence of attempts to address the problems, but they are also necessarily evidence of awareness of the problems. Further, if a reasonable jury finds the conditions existed as Roy claims, which it could, the same jury could find that those conditions would have been readily apparent to McCain during his visits to the gym. Not to mention it seems in McCain's Motion for Summary Judgment and his sworn declaration that he admits to the presence of most, if not all, of the conditions Roy complains of.

Moreover, viewing the facts in the light most favorable to Roy, it is reasonable to infer that McCain was privy to the same baseline knowledge as Warden Akwitti: that medically vulnerable inmates were housed on the gym floor for an extended time under debased conditions which were not effectively addressed through, what appears to be, routine maintenance and pest control. *See* Dkt. No. 34 at 6 (Roy and others were assigned to the gym floor because of "prescription medication[s.]").

A reasonable jury could find that despite McCain taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. Thus, as with Akwitti, a reasonable jury could find: (1) McCain was aware that a large number of inmates, including Roy, were assigned to the gym, and that McCain was likely involved in that decision as assistant warden; (2) due to the inmates having either a medical

19

or mental health condition or treatment; (3) McCain was aware of the adverse conditions in the gym; (4) McCain was aware the conditions persisted weeks if not months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether McCain acted with deliberate indifference.

### 2. The Second Prong: Clearly Established

Finding that a jury could resolve the first prong in Roy's favor, the undersigned turns now to whether Roy's right to be free from those conditions was clearly established. This second prong involves "two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998). Because the undersigned finds that the law was not clearly established, the undersigned does not discuss whether the Defendants' conduct was objectively unreasonable.

Defendants urge that "even assuming arguendo that the Court finds sufficient evidence of a constitutional violation, Warden Akwitti and Warden McCain would still be entitled to qualified immunity because their actions were objectively reasonable in light of clearly established law." Dkt. No. 34 at 12. They continue, "there is simply no precedent holding that pests and leaking toilets being actively controlled and maintained amounts to a constitutional violation." *Id*.

"To be clearly established, a right must be sufficiently clear that every reasonable

official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). Even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

"There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, the plaintiff may identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)) (internal quotation marks omitted). This first approach "do[es] not require a case directly on point[.]" *Batyukova*, 994 F.3d at 726. But the existence of the right must be "sufficiently clear" that every reasonable officer would have understood the challenged conduct to have been unlawful. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). In other words, "'[t]he central concept is that of "fair warning": The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warnings that the conduct at issue violated constitutional rights.'"" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

As the Fifth Circuit has explained:

> Rights are "clearly established" when "existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 584 U.S.100, 104–05, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15, 136 S. Ct. 305, 193 L.E.2d 255 (2015) (per curiam)), *not* when a rule is merely "suggested by then-existing precedent," *City of Tahlequah v. Bond*, 595 U.S.9, 12, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (per curiam). The Supreme Court recently . . . reminded lower courts "not to define clearly established law at too high a level of generality." *Id.* Rather, courts must determine that existing precedent has rendered the right "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S. Ct. 4, 8, 211 L.Ed.2d 164 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)).

*Henderson v. Harris Cty*., 51 F.4th 125, 132–33 (5th Cir. 2022).

The second way a plaintiff may demonstrate that a law is clearly established is with "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590). "[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). But "[t]he standard for obviousness is sky high[.]" *Joseph*, 981 F.3d at 337.

Whether a right is clearly established is typically a question of law, but there may be factual disputes which are relevant to the determination. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024). But ultimately, to defeat an assertion of qualified immunity, the plaintiff "has the burden to point out clearly established law [and] rais[e] a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). Again, Roy has not filed a response to the Motion.

22

a.  <u>A case or body of caselaw</u>

Pertaining to the "case or body of caselaw" path of demonstrating clearly established rights, the Court's "fair warning" inquiry should consider only published opinions issued before Roy's assignment to the gym floor on September 26, 2022. *Tolan*, 572 U.S. 650, 656 (2014) (the second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation); *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (because unpublished opinions are not precedential, they "do not establish any binding law for the circuit" and thus "cannot be the source of clearly established law for qualified immunity analysis").

To find that Roy raised a fact issue on whether his constitutional rights were violated required the undersigned to string together a varied combination of lesser-included fact issues about the individual conditions themselves, the length of time Roy was exposed to those conditions, and Roy's particular medical conditions. But it is the same complexity of how all these variables interact that preclude a finding that they violated clearly established law.

True, Roy is not required to marshal a case on point. And there are some cases which cite to the holding in *Burleson v. Texas Dept. of Criminal Justice* that "Burleson alleged a violation of a clearly established constitutional right: the Eighth Amendment right to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health." 277 F.3d 1374, *2 (2001). But the undersigned does not read *Burleson*, an unpublished decision, as establishing such a broad, general "clearly established right." Other conditions-of-confinement cases that might apply here similarly define that right at

23

too high a level of generality to conclude that those cases "squarely govern" this case. *Cope v. Cogdill*, 3 F.4th 198, 204–05 (5th Cir. 2021) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12 (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" (internal quotation marks and citation omitted))).

The authority that does exist is not sufficiently specific to put all reasonable officials on notice that Defendants' conduct was definitively unlawful. *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). Nor has Roy pointed to a body of law that would put the unconstitutionality of these combined conditions "beyond debate." *Ashcroft*, 563 U.S. at 741. Reasonable minds could make arguments either way. Therefore, even though the undersigned finds that Roy has created factual disputes regarding whether Defendants violated his right to safe and sanitary living conditions, there was no clearly established body of law at the time that would have put every reasonable officer on notice that this complex set of circumstances definitively violated that right.

   b.  Obvious exception

The facts here also do not meet the "obvious" exception. *Taylor* and *Pelzer* involved circumstances so egregious that any reasonable officer would have known they violated the Constitution. In *Taylor*, prison officials confined an inmate for six full days in two "shockingly unsanitary cells"—one covered nearly floor to ceiling in massive amounts of feces, and the other frigidly cold with urine on the floor where the inmate was required to sleep naked. 592 U.S. at 7–8. In *Pelzer*, an inmate was restrained to a hitching post for seven hours without bathroom breaks as punishment, forced to remove his shirt so the sun

24

would burn his skin, and taunted with water given first to the dogs and then spilled on the ground. 536 U.S. at 734–35.

Roy may have been forced to endure the conditions here for a significantly longer period of time. And it has been suggested that the need for granularity with the "clearly established" prong may be more leniently applied where "the correctional officers had plenty of time to assess their horrific conduct and recognize that it obviously violated the law." *Villarreal*, 134 F.4th at 282 (Oldham, J., concurring). Judge Oldham explained that with the egregious facts of *Taylor*, "it was of no moment that precedent had only clearly established a general prohibition on 'inhumane' conditions of confinement", especially in light of no "exigency". *Id.* (citing *Farmer*, 511 U.S. 832). That said, Judge Oldham observed at the same time, "the Court had apparently 'never—until Taylor—actually used' the obviousness standard 'to decide a case.'" *Id*. fn 6 (citing Comment, *Taylor v. Riojas*, 135 HARV. L. REV. 421, 429 (2021)).

The standard for holding Defendants liable based on "obviousness," rather than clearly established law, is exceptionally high. *Joseph*, 981 F.3d at 337. Although the conditions here were deplorable, they do not rise to the level of deplorability in *Taylor* or *Pelzer*.

Roy can show genuine issues of material fact as to the first prong analysis—a constitutional violation—but not as to the second prong analysis—clearly established. Therefore, the Defendants are entitled to qualified immunity.[7]

_____

[7] Because Defendants are entitled to qualified immunity, this case should be dismissed. Although Defendants' repeatedly assert that the medical records show "there was no aggravation of [Roy's]

## V.  CONCLUSION

The facts, when viewed in the light most favorable to Roy, would permit a reasonable jury to find that Roy was objectively exposed to a substantial risk of serious harm and that the Defendants were subjectively indifferent to that risk. But the Court should conclude that Roy's right to be free from the objectively serious conditions was not clearly established at the time. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant Akwitti and McCain's Motion for Summary Judgment on Qualified Immunity.

## VI.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions

---

preexisting hip injury or physical impact on his health for his alleged lack of adequate sleep", Dkt. No. 34 at 6, Roy's injury, if any, is irrelevant to Defendants' entitlement to qualified immunity.

of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII. CASE TRANSFER

Having completed the preliminary screening of Roy's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action Number No. 1:23-CV-00032-H.

ORDERED this 22nd day of January 2026.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE